# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRENDA HEAPS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-CV-598-PJC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Brenda Heaps ("Heaps"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Heaps appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Heaps was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**[1]

Heaps was 51 years old at the time of the hearing before the ALJ on May 22, 2012. (R. 35). Heaps completed the eleventh grade. *Id.* She had worked as a housekeeper for 13 years. (R. 36). She testified that she was no longer able to clean houses due to symptoms of anxiety and due to the physical aspects of the work. (R. 42).

Heaps had last worked as a receptionist at a pharmaceutical company. (R. 36). She testified to difficulty working due to frequent crying spells. (R. 42). She said that she would cry intermittently throughout the day for no reason. (R. 41-42). She would cry to the point that her eyes would swell. (R. 42). Heaps had to constantly be reminded to do things. (R. 46). She made frequent mistakes, like shipping medications to the wrong person or wrong address. *Id.* Heaps was fired and was told it was because she was not performing her job duties, including being away from her desk too often. *Id.*

Heaps testified that she experienced panic attacks once or twice a day. (R. 38). Her attacks occurred at random and in any setting. (R. 39). She did not know what triggered her attacks. *Id.* During her attacks, she felt as if the walls were closing in on her, and she had difficulty breathing. *Id.* Heaps used an Albuterol inhaler and breathing treatments at home to control her breathing during her attacks. (R. 38). She experienced three panic attacks on the day of the hearing. *Id.*

Heaps testified to problems with self-imposed isolation. (R. 37-39). She said that she did not like to be around people and did not like to leave her home. (R. 39). Heaps testified that she

---

[1] Heaps said that she had swelling in her legs, numbness in her fingers due to carpal tunnel surgery, and back problems. (R. 40-41, 43-44). Because Heaps' appeal is based solely on mental limitations, the Court is not including a summary of her medical records concerning her physical limitations.

did not do anything that was fun. (R. 48). She reported that she no longer went to church, because she was too tired. *Id.*

Heaps said that she had problems focusing and that her mind wandered. (R. 44-45, 47). Heaps did household chores, but it took her longer due to her focus problems. (R. 47). As an example, she said that she could be doing the dishes and not be able to finish, because she would suddenly start worrying if something bad was going to happen to her son. (R. 44-45). Heaps said that she had started painting several rooms in her home about six months before the hearing, but she had not yet finished. (R.45).

Heaps testified that she saw Dr. Goforth for her symptoms in 2008, and he diagnosed her with a panic disorder. (R. 37-38). He first prescribed Xanax, but she did not like the way it made her feel. *Id.* Several other psychiatric medications were tried, but Heaps found that none of them helped. *Id.*

Heaps additionally received treatment for her symptoms at Family & Children Services ("FCS"). (R. 39). Heaps said that she attended group counseling, because individual sessions were not available at FCS. *Id.* Heaps reported that she would have preferred talking to a counselor individually, because she was uncomfortable in a group. *Id.* Heaps stopped going to counseling, because she felt that it was not helping her. *Id.* She felt that the only benefit from FCS was her medication refills. *Id.* When asked if her symptoms had improved since 2008, she responded that they were "a little bit better, but not very much." (R. 38). At the time of the hearing, she had an appointment with her family doctor to arrange individual counseling. (R. 40).

Heaps said that she had tiredness and difficulty sleeping. (R. 44, 46). She took Ambien to help her sleep, but she continued to have problems maintaining sleep. (R. 46). Heaps said that

she did not drive much and only drove when she was unable to find a ride. (R. 46-47). Driving in heavy traffic made her "real nervous" and caused her to have "little panic attacks." (R. 47). Heaps said that she last drank alcohol in 2010. (R. 48-49). She occasionally smoked cigarettes. (R. 49).

Heaps saw Gary K. Goforth, D.O. from 2008 through 2011. (R. 280-303). These hand-written treatment notes are difficult to read, but it appears that Heaps was treated for symptoms of depression, panic attacks, crying spells, abnormal stress, chest pain syndrome, dyslipidemia, former tobacco abuse, and hypertension. *Id.* Appointment notes of January through March 2010 reflect that Dr. Goforth prescribed Prozac and lorazepam.[2] (R. 282).

On April 3, 2010, Heaps presented for voluntary inpatient treatment at Laureate Psychiatric Clinic and Hospital ("Laureate"). (R. 232-54, 285-94). At her intake interview, she appeared drowsy, disheveled, depressed, sad, and tearful. (R. 233, 242). Heaps reported problems with crying spells, chronic depression, anxiety, social isolation, feelings of guilt, and a decreased appetite. (R. 232). She reported a history of suicidal ideation. (R. 232-33). She said that she had thought of shooting herself about two months earlier. (R. 233). Heaps said that she had been cutting her arm with a serrated knife over a two-day period to relieve some of the "the hurt I feel inside." (R. 232). She reported difficulty being in public places due to anxiety. *Id.* Heaps reported a 60-pound weight loss since October 2009. *Id.* Heaps said that her symptoms were related to the recent death of her brother and to marital problems. *Id.* Heaps said that she had been taking Prozac and lorazepam for about four months, but she felt her Prozac was making her symptoms worse. (R. 242). Heaps said that she had started drinking vodka about four days

---

[2] Lorazepam is a medication used to treat anxiety. *Dorland's Illustrated Medical Dictionary* 1089-90 (31st ed. 2007).

earlier to help her sleep, and she was intoxicated at the time of admission. (R. 233, 242). The admitting doctor wrote that medications prescribed by Heaps' primary care physician were not controlling her depressive symptoms and that she was "desperate for help." (R. 242). She was admitted for "deterioration in functioning." *Id.* Her Axis I[3] diagnosis on admission was depressive disorder, not otherwise specified. (R. 233). Heaps' Global Assessment of Functioning ("GAF")[4] was assessed as 30, with 65 as the highest in the past year. *Id.*

Heaps was discharged on April 5, 2010, after successfully participating in her treatment plan and experiencing improvement of her symptoms. (R. 243). Heaps was given a good prognosis with appropriate follow-up treatment and medication compliance. *Id.* She was discharged to her sister's care and instructed to continue her medications and to follow up with outpatient therapy at FCS. (R. 246, 288). She was given prescriptions for lorazepam for anxiety, Paxil for mood, and trazodone for sleep. (R. 243-44). Her discharge diagnoses were major

---

[3] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[4] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning," and 51-60 reflects moderate symptoms or moderate difficulty in functioning. *Id.* Scores between 61-70 reflect "some mild symptoms" or "some difficulty" in functioning, but "generally functioning pretty well." *Id.* A score between 71 and 80 reflects symptoms that are transient and reactions to stressors with no more than slight impairment in functioning. *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

depressive disorder, single, severe, without psychotic features; and panic disorder with agoraphobia. (R. 251). Her GAF score was 50. *Id.*

Heaps presented to FCS for an intake evaluation on April 6, 2010. (R. 256-63). Heaps was evaluated by Elka Serrano, M.D. (R. 264-65). Heaps told Dr. Serrano that she was "doing well" and was not having any side effects to her medications. (R. 264). Heaps complained of difficulty sleeping, low energy, decreased interest, and a decreased appetite. *Id.* Heaps described both her mood and concentration as "okay." *Id.* Heaps reported experiencing intermittent symptoms of anxiety that included shortness of breath, increased heart rate, and sweating. *Id.* Heaps said that she cut herself to help alleviate her anxiety. *Id.* She described a suicide attempt about five months earlier. *Id.* She reported that she had been hospitalized the past December for suicidal ideation with a plan to shoot herself. *Id.* Heaps' medications included Paxil, lorazepam, and trazodone. *Id.* Dr. Serrano noted that Heaps had tried other psychiatric drugs that had been ineffective. *Id.* Dr. Serrano's Axis I diagnoses were major depressive disorder, recurrent, moderate; rule out posttraumatic stress disorder; rule out panic disorder; and alcohol abuse. (R. 265). Dr. Serrano scored Heaps' GAF as 60 to 65. *Id.* Dr. Serrano continued Paxil and trazodone, discontinued lorazepam, added Vistaril for anxiety, and recommended therapy. *Id.*

At Heaps' appointment with her case manager at FCS on April 12, 2010, she complained of pain in her stomach and back due to her medications. (R. 266). Heaps appeared depressed, sad, tearful, alert, and fully-oriented. *Id.* When seen on April 26, 2010, she was not experiencing any medication side effects. (R. 268). On May 3, 2010, she reported that her medications were improving her depression. (R. 269). The appointment note reflects that Heaps reported "ongoing efforts to gain employment." *Id.*

6

Heaps presented to Dr. Serrano on June 23, 2010. (R. 270). Heaps reported improvement of her mood, energy, and appetite. *Id.* Heaps said that she was taking her medications as prescribed, and that her Vistaril was making her cough. *Id.* She reported problems sleeping. *Id.* She denied experiencing suicidal or homicidal ideation or psychosis. *Id.* Her diagnosis was major depressive disorder. *Id.* Dr. Serrano continued Heaps' medications and increased trazodone for sleep. *Id.* On August 26, 2010, Heaps reported intermittent episodes of depression. (R. 271). Heaps was taking her medications as prescribed, and her sleep, appetite, and energy had improved. *Id.* Dr. Serrano continued her diagnosis of major depressive disorder. *Id.* Heaps' Paxil was increased to treat "residual depression/anxiety symptoms." *Id.*

When seen by her case manager at FCS on October 11, 2010, Heap was alert, well-groomed, oriented in three spheres, and calm. (R. 272). She requested assistance with housing. *Id.* Heaps returned on October 18, 2010, and her treatment plan was updated. (R. 258-63). Heaps reported problems sleeping. (R. 261). She stated that she had not been attending group counseling because she was shy and did not like talking in front of others. (R. 258). She reported feeling "free, happier, and content." (R. 260). Her motivation and energy were good, and she was socializing with her friends and her family, going out to eat, playing the drums, listening to music, and managing her personal care. (R. 260-61). She was given a "fair" prognosis with continued medication compliance and case management. (R. 261). On November 23, 2010, her case manager said that Heaps was alert, well-groomed, oriented in three spheres, and calm. (R. 273). Her eye contact and speech were good. *Id.* At her request, Heaps was given referrals for assistance with medical and dental care. *Id.*

On December 13, 2010, Dr. Serrano noted improvement after the increase of Heaps' Paxil. (R. 274). Heaps reported that her sleep, appetite, and energy were good. *Id.* Dr. Serrano

7

again diagnosed major depressive disorder. *Id.* At her appointment with Dr. Serrano on March 18, 2011, Heaps reported improvement in her appetite and sleep, but she complained of low energy. (R. 275). She described her mood as "okay." *Id.* Dr. Serrano again continued a diagnosis of major depressive disorder. *Id.*

On April 15, 2011, Heaps saw her case manager at FCS, and she was alert, well-groomed, and oriented in three spheres. (R. 276). The appointment note reflects that Heaps was to schedule her next case management appointment after she "gets her work schedule." *Id.*

Dr. Goforth completed a one-page "Treating Physician Mental Functional Assessment Questionnaire" on April 15, 2011. (R. 281). He said Heaps' psychiatric diagnosis was panic disorder with agoraphobia. *Id.* Dr. Goforth said that Heaps was unable to control her panic attacks, limiting her ability to function. *Id.* He wrote that she had a fear of crowds and did not feel comfortable leaving home. *Id.*

Heaps saw Twilah Fox, M.D., at FCS for medication review on September 16, 2011. (R. 372-73). Dr. Fox noted that Heaps had been off of her medications since April or May 2011, and she prescribed Effexor, Ambien, and doxepin. (R. 372). Dr. Fox's diagnosis was major depressive disorder, recurrent, severe, without psychosis. *Id.*

On October 25, 2011, Heaps' treatment plan was updated at her appointment at FCS. (R. 367-69, 374-75). The plan reflects that Heaps had made good progress. (R. 367-69). Heaps stated that she had a positive attitude, was good with kids and older people, was no longer shy, and was easy-going. (R. 367) She said that she no longer placed herself in bad situations. (R. 368-69). She had learned to trust people, and she no longer focused on the past. *Id.* She was riding her bike or her motorcycle. *Id.*

Dr. Fox's progress note of January 9, 2012, reflects that Heaps was "stable." (R. 376). Dr. Fox discontinued Effexor, noting that it was ineffective. *Id.* She added Paxil, but noted that Heaps had experienced pain in the left top of her head when she was previously on the medication. *Id.*

Agency consultant Minor Gordon, Ph.D., conducted a psychological examination of Heaps on May 26, 2011. (R. 305-08). Dr. Gordon noted that Heaps appeared sad, mildly anxious, and depressed. *Id.* Heaps reported experiencing nightmares and difficulty sleeping. (R. 306). She reported a low level of energy. *Id.* On examination, Dr. Gordon found that Heaps' motor activity was less than normal. *Id.* He wrote that "her direction appears to be governed by life on a day to day basis." *Id.* He said that Heaps could pass judgment in a work situation, could avoid common danger, and could maintain her personal hygiene. *Id.* He found that Heaps might have occasional difficulty communicating with the general public due to her problems with anxiety. *Id.* Dr. Gordon said that Heaps' social-adaptive functioning was within normal limits, except for her difficulty dealing with the public due to her anxiety. (R. 307). He said that Heaps' anxiety and mild depression would not preclude her from gainful employment. *Id.* Dr. Gordon's Axis I diagnoses were mild anxiety and depression, not otherwise specified. *Id.* He scored Heaps' GAF as 70. *Id.*

Non-examining agency consultant, Phillip Massad, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment on May 31, 2011. (R. 309-26). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Massad indicated that Heaps had a mood disturbance of depressive syndrome. (R. 312). For Listing 12.06, Dr. Massad indicated that Heaps had an anxiety-related disorder. (R. 314). For the

"Paragraph B Criteria,"[5] Dr. Massad said that Heaps had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation. (R. 319). In the "Consultant's Notes" portion of the form, Dr. Massad noted Heaps' April 2010 hospitalization at Laureate. (R. 321). He summarized Dr. Gordon's report and Heaps' activities of daily living. *Id.*

In Dr. Massad's Mental Residual Functional Capacity Assessment, he found that Heaps had moderate limitations in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the public. (R. 323-24). He wrote that Heaps was able to perform simple and some complex tasks with routine supervision. (R. 325). Heaps was able to relate to supervisors and peers on a superficial work basis. *Id.* Heaps was not able to relate to the general public, but she could adapt to a work situation. *Id.*

**Procedural History**

Heaps filed her applications for disability insurance benefits and supplemental security income benefits on March 28, 2011 and April 4, 2011, respectively. (R. 137-45). Heaps asserted onset of disability on January 25, 2010. (R. 137). The applications were denied initially and on reconsideration. (R. 76-84, 87-92). An administrative hearing was held before ALJ Richard J. Kallsnick on May 22, 2012. (R. 31-57). By decision dated June 4, 2012, the ALJ found that

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

Heaps was not disabled. (R. 19-30). On July 11, 2013, the Appeals Council denied review. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

## Decision of the Administrative Law Judge

In his decision, the ALJ found that Heaps met insured status requirements through March 31, 2013. (R. 21). At Step One, the ALJ found that Heaps had not engaged in any substantial gainful activity after her alleged onset date of January 25, 2010. *Id.* At Step Two, the ALJ found that Heaps had severe impairments of depression and anxiety. *Id.* At Step Three, the ALJ found that Heaps' impairments did not meet any Listing. (R. 22-23).

The ALJ found that Heaps had the RFC to perform work at all exertional levels. (R. 23). For mental limitations, the ALJ said that Heaps was limited to simple and some complex tasks. *Id.* She could perform routine work with ordinary supervision. *Id.* She could relate to coworkers and supervisors for work purposes. *Id.* She could not relate to the public, and she should have "minimum or no contact with them." *Id.* At Step Four, the ALJ determined that Heaps could return to her past relevant work as a housekeeper. (R. 25). As an alternative finding at Step Five,

the ALJ found that there were a significant number of jobs in the national economy that Heaps could perform, taking into account her age, education, work experience, and RFC. (R. 25-26). Therefore, the ALJ found that Heaps was not disabled from January 25, 2010, through the date of his decision. (R. 26).

## Review

Heaps makes only one argument in this proceeding: "Defendant improperly evaluated a consultative examiner's opinion and improperly afforded a consultative examiner preferential weight." Plaintiff's Opening Brief, Dkt. #14, p. 5. Regarding the single issue raised by Heaps, the Court finds that Heaps has waived the issue because her argument is not sufficiently developed to allow for meaningful review. Moreover, even absent a finding of waiver, the ALJ's decision is supported by substantial evidence and complies with legal requirements. Thus, the ALJ's decision is **AFFIRMED**.

Before proceeding to review Heaps' single issue on appeal, the Court addresses the requirement that a Social Security claimant must adequately develop arguments before a district court. *Wall*, 561 F.3d at 1066. In *Wall*, the court discussed an argument related to the claimant's RFC. *Id.* The Tenth Circuit noted that at the district court level, the claimant had merely alleged, several times, that the ALJ had failed to consider the objective medical evidence. *Id.* The appellate court cited to the opinion of the district court judge, stating that "[b]ecause Claimant's counsel failed to present any developed argumentation in regard to Claimant's physical impairments, the district court obviously viewed this issue as waived." *Id.* The Tenth Circuit called the claimant's argument at the district court "perfunctory," and said that it had deprived that court of the opportunity to analyze and rule on that issue. *Id.* (quotation and citation omitted). *See also Krauser v. Astrue*, 638 F.3d 1324, 1326 (10th Cir. 2011) (Tenth Circuit's review is

13

limited to issues the claimant preserved at the district court level and adequately presented on appeal); *Sullivan v. Colvin*, 519 Fed. Appx. 985, 987 (10th Cir. 2013) (unpublished) (affirming lower court's finding of waiver on credibility issue).

Here, Heaps' Opening Brief states the single issue as quoted above. Plaintiff's Opening Brief, Dkt. #14, p. 5. Preliminary matters including the legal standard of review are discussed through the first six pages of Heaps' Opening Brief. *Id.*, pp. 1-6. The top of page seven is a recitation of the factors to be considered by an ALJ in evaluating opinion evidence. *Id.*, p. 7. At that point, Heaps finally gives some hints about the issue she is raising. She notes that the ALJ gave "deferential weight" to the opinions of agency examining consultant Dr. Gordon and agency nonexamining consultant Dr. Massad "[w]hen analyzing these records as compared to the records from" FCS. *Id.* Heaps then says that the ALJ had "produced one sentence of analysis to prefer the opinions of two consultative examiners to Plaintiff's longitudinal treating physicians." *Id.* She complains that the ALJ did not discuss the factors set out in the regulations, and she states that the ALJ's decision was not supported by substantial evidence. *Id.* That is the sum total of Heaps' discussion of her one issue raised before this Court.

What is lacking from this one-half page of discussion is any identification of what opinion evidence Heaps claims was given by her treating physicians, whom she identifies with only one reference to FCS. Because Heaps does not explain what opinion evidence was given by her treating physicians, she therefore does not explain what the differences were between that opinion evidence and the opinions given by Dr. Gordon and Dr. Massad. Further, other than stating that the ALJ gave deferential weight to the opinions of Dr. Gordon and Dr. Massad, Heaps does not identify any particular opinions of those two consultants that she argues were wrong or prejudicial to her claim of disability. Heaps does not give any citations to the medical evidence within the

administrative transcript. Without some designation by Heaps of the treating physician opinion evidence that should have been given deference by the ALJ, together with some explanation of how that evidence contrasted with the opinions of Dr. Gordon and Dr. Massad, this Court has no ability to analyze and rule on the issue Heaps attempts to raise.

The inadequacy of Heaps' development of this issue is similar to that of the claimant in *Threet v. Barnhart*, 353 F.3d 1185, 1190 (10th Cir. 2003). The *Threet* court explained that it was unable to address the claimant's first issue that the ALJ erred in failing to articulate reasons for disregarding the opinions of treating physicians because the argument was not sufficiently developed. *Id.* "[C]laimant does not identify which treating physician she feels was ignored, and we will not speculate on her behalf." The Tenth Circuit left the first issue at that and went on to the claimant's other arguments. *Id.* Similarly, the Tenth Circuit has said that it was a "dangerous practice" for a claimant to leave the court to "comb through the briefs and the record" to ascertain what claimant's arguments were. *Eacret v. Barnhart*, 120 Fed. Appx. 264, 265-66 (10th Cir. 2005) (unpublished). The *Eacret* court said that it was "not required to speculate on what a party is arguing or to craft her arguments for her." *Id.* at 266. *See also Gilbert v. Astrue*, 231 Fed. Appx. 778, 782 (10th Cir. 2007) (unpublished) (when claimant did not cite to the medical records in support of her argument regarding treating physician opinion evidence, court would not "sift through" the record to find support for her arguments). *Threet* and these other authorities illustrate that this Court has no ability to analyze and rule on the issue Heaps attempts to raise, and this Court will not speculate on what Heaps' arguments are. Heaps has waived her one issue due to her failure to develop her argument in a fashion that allows for meaningful review.

In her Reply Brief, Heaps identifies opinions of Dr. Gordon and Dr. Massad and then identifies treating evidence that she contends is "drastically" different. Plaintiff's Reply Brief,

15

Dkt. #16, pp. 2-4. In our circuit, however, a party is too late when an issue is raised or an argument is made for the first time in a reply brief. *Porter v. Colvin*, 535 Fed. Appx. 760, 762-63 (10th Cir. 2013) (unpublished) (arguments made for the first time in a reply brief are waived); *Ridgell-Boltz v. Colvin*, 565 Fed. Appx. 680, 683 n.3 (10th Cir. 2014) (unpublished) (same). The Court finds that Heaps has waived the issue of any possible error by the ALJ in failing to analyze treating physician opinion evidence and in giving more weight to the opinion evidence of Dr. Gordon and Dr. Massad.

In the interest of judicial economy, however, the Court finds that, after considering Heaps' arguments as further developed in her Reply Brief, the ALJ's decision is in compliance with legal requirements. The Tenth Circuit has commented on a court's role in reviewing an ALJ's discussion of opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence. Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary*, 695 F.3d at 1167. The court also said that "common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection." *Id.* at 1166.

In her Reply Brief, Heaps says that the opinions of Dr. Massad and Dr. Gordon "drastically differed with the opinions of Plaintiff's treating physicians." Plaintiff's Reply Brief, Dkt. #16, p. 2. Heaps then goes on to identify Laureate records that Heaps could not stop crying, had been avoiding her friends, and had panic attacks. *Id.* Heaps also cites to records of Dr. Goforth that reflected that Heaps had bad panic attacks, was very depressed, and could not stop crying, along with a statement that her medications were not working. *Id.*, pp. 2-3. The Court notes that Heaps

16

does not identify any FCS records in her Reply Brief, even though FCS was the only identifying reference to treating evidence that Heaps made in her Opening Brief.

The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." Thus, the *Cowan* court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Sullivan*, 519 Fed. Appx. at 988; *Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations). All of the observations of the Laureate physicians and Dr. Goforth that are cited by Heaps in her Reply Brief are general statements concerning Heaps' psychological symptoms. These general statements do not address Heaps' functional limitations, and, thus, they were not true medical opinion, and the ALJ was therefore not required to analyze them as opinion evidence.

Heaps' final argument is that Dr. Gordon's GAF score of 70 was "in stark contrast" to the GAF score of 30 assigned at Laureate. Plaintiff's Reply Brief, Dkt. #16, pp. 3-4. The Tenth Circuit has in some cases found a GAF score to be treating physician opinion evidence that is required to be analyzed as such in accordance with the factors set out in regulations and case law. *See, e.g., Givens v. Astrue*, 251 Fed. Appx. 561, 567 (10th Cir. 2007) (unpublished) (ALJ erred by rejecting treating physician's GAF score of 50 without explanation). In other cases, however, the

Tenth Circuit has said that a GAF score by itself has no significance unless the medical source specifies how the claimant's functional abilities are affected. *See, e.g., Atkinson v. Astrue*, 389 Fed. Appx. 804, 808 (10th Cir. 2010) (unpublished) (examining consultant psychiatrist's GAF score of 44 did not indicate impact on claimant's functional abilities).

Here, the ALJ did not recite any of the GAF scores included in the administrative transcript. While the ALJ's discussion of the medical evidence was limited, the ALJ did explain that Heaps had been hospitalized in April 2010 for suicidal ideation with intent. (R. 24). He then discussed Dr. Gordon's report, and later cited to some of the FCS treatment records that showed that Heaps was "making good progress." *Id.* While more comprehensive discussion and explanation by the ALJ would have made this Court's task easier, the undersigned finds that the reasoning of the ALJ can be followed because his discussion of the treating evidence reflected that Heaps was not doing well at the time of her Laureate hospitalization and Heaps' condition then improved. *Id.*

The Court finds first, based on the precedent of *Atkinson* and similar cases, that the Laureate assigned GAF of 30 was not treating opinion evidence because it did not address Heaps' functional limitations. Even if the GAF score was opinion evidence, the "stark contrast" of which Heaps complains between the two GAF scores of 30 and 70 was not so much the comparison of a treating source with an examining source as it was the contrast in Heaps' condition in April 2010 when compared to her condition during the consultative examination with Dr. Gordon in May 2011. Heaps' improvement over time, noted by the ALJ in his discussion of the treating evidence, is further illustrated by other GAF scores not mentioned by Heaps. While Heaps' GAF was

scored as 30[7] upon admission to Laureate on April 3, 2010, her GAF was scored as 50 when she was discharged two days later on April 5, 2010. (R. 233, 251). When Heaps presented to Dr. Serrano the next day, April 6, 2010, Dr. Serrano scored Heaps' GAF as 60 to 65. (R. 265).

Thus, while it would have been better practice for the ALJ to specifically mention all of the GAF scores and to explain in more detail why he gave great weight to the opinion evidence of Dr. Gordon and Dr. Massad, the ALJ's reasoning here is adequate for this Court to follow, and it complies with legal requirements. If the GAF score of 30 was treating opinion evidence, and the Court finds that it is not, the ALJ's reasoning that Heaps had improved considerably after the April 2010 hospitalization is supported by the substantial evidence that he discussed in his decision as well as by other records that the ALJ failed to cite, such as the other GAF scores.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 26th day of January 2015.

Paul J. Cleary
United States Magistrate Judge

---

[7] This admission GAF score also stated that Heaps' highest GAF in the past year had been 65. (R. 233).